IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DANIEL R. SHERZER, et al.:     CIVIL ACTION
                                :
     v.                        :
                                :
HOMESTAR MORTGAGE         :
SERVICES, et al.          :    NO. 07-5040

MEMORANDUM

McLaughlin, J.                           March 27, 2015

        This dispute arises under the Truth in Lending Act ("TILA"), 15 U.S.C. §§ 1601 et seq. Daniel R. Sherzer and Geraldine Sherzer, plaintiffs, brought suit against Homestar Mortgage Services, LLC ("Homestar"), and HSBC Bank USA ("HSBC"), defendants,[1] for violation of TILA and pendant state law claims. The plaintiffs contend that the defendants failed to make material disclosures at the time of settlement such that rescission of their loans is appropriate. In February 2014,[2] the

---

[1] The plaintiffs originally also filed suit against two other defendants: CIT Group/Consumer Finance, Inc. and Mercury Mortgage Partners. After these defendants reached a settlement with the plaintiffs, the Court ordered on July 26, 2011, that all claims against them be dismissed with prejudice. Docket No. 72.

[2] The defendants filed its motion on February 20, 2014 (Docket No. 126). Although the Court granted the plaintiffs an extension until March 19, 2014, to respond, the plaintiffs did not file any response by that date (Docket No. 131).

        On October 31, 2014 -- notably, a full seven months after the plaintiffs' response was due -- Mr. Sherzer informed the Court that he "recently procured a lawyer" and that his lawyer would be responding within the following week to the defendants' motion (Docket No. 134). Despite the long delay, the Court

defendants filed a motion for summary judgment,[3] arguing that the plaintiffs have failed to establish a right to rescission under TILA, and, in the alternative, have failed to establish that they even have the ability to tender back the loan proceeds as would be required in a TILA rescission scenario.  The plaintiffs did not oppose the motion.  For the reasons that follow, the defendants' motion for summary judgment is granted.

I.   Factual and Procedural History[4]

On August 26, 2004, the plaintiffs took out a mortgage on their home with Homestar, which consisted of two loans.[5]  Sherzer v. Homestar Mortg. Servs., 849 F. Supp. 2d 501, 503 (E.D. Pa. 2011); Docket No. 16-1.  The following December 1, the

---

stated that it would consider the arguments of the new lawyer if they were received (Id.).  No new appearances were made in the intervening five months and Mr. Sherzer has not otherwise responded.

[3] The defendants had previously filed a motion for judgment on the pleadings (Docket No. 52), which the Court had granted (Docket No. 85).  That decision was reversed by the Third Circuit on the question of what mechanism is adequate to exercise rescission (Docket No. 89).

[4] Given the long procedural history of this case, the Court incorporates into this memorandum the detailed factual history as laid out in its early decision as well as the Third Circuit's. Sherzer v. Homestar Mortg. Servs., 707 F.3d 255, 256 (3d Cir. 2013); Sherzer v. Homestar Mortg. Servs., 849 F. Supp. 2d 501 (E.D. Pa. 2011) rev'd, 707 F.3d 255 (3d Cir. 2013).

[5] Only the first (larger) loan is at issue in this case because HSBC agreed to rescind the second loan.  Docket No. 16-1.

2

plaintiffs failed to make payment on the first loan and have not made a single payment thereafter. See, e.g., Docket No. 16-1. In April 2006, HSBC began foreclosure proceedings against the plaintiffs in the Court of Common Pleas, Montgomery County, Pennsylvania, seeking to recoup the amounts then due on the loan ($738,752.90, plus interest and fees) as well as the property at issue by sale. Id. Subsequently, on May 11, 2007 -- less than three years after the plaintiffs first took out the loans -- the plaintiffs sent a letter to Homestar seeking rescission of their loans, alleging that certain charges should have been included in the finance charge but were not and that the loans were therefore under-disclosed in an amount authorizing rescission. Id; Docket No. 126. In November 2007, the plaintiffs filed this suit against the defendants, which served to suspend the foreclosure proceedings against them. In the interim, because the plaintiffs had failed to pay certain taxes and insurance over the years since their default, HSBC has paid escrow advances for approximately $105,533.40 on behalf of the plaintiffs. Docket No. 126.

II.  <u>Legal Standard</u>[6]

Rule 56 of the Federal Rules of Civil Procedure provides that a court may grant summary judgment when the moving party proves that there is "no genuine dispute as to any material fact" and when the moving party is otherwise entitled to summary judgment as a matter of law.  Fed. R. Civ. P. 56(a).  As the Supreme Court reiterated in <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 327 (1986), summary judgment "is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'"  <u>Id</u>. (citing Fed. R. Civ. P. 1).  Because survival of summary judgment depends on the existence of a "genuine dispute as to any material fact," the burden is on the nonmoving party to set forth those facts which would demonstrate a genuine issue for trial.  <u>Celotex</u>, 477 U.S. at 323.

In deciding a motion on summary judgment, "the court is obliged to take account of the entire setting of the case and must consider all papers of record as well as any materials prepared for the motion."  <u>Celotex</u>, 477 U.S. 331 n.2 (citing 10A Wright, Miller & Kane § 2721, p. 44).  The Court considers the facts presented, and the inferences to be drawn from those facts,

---

[6] The Court exercises jurisdiction pursuant to 15 U.S.C. § 1640(e).

in the light most favorable to the nonmoving party, here the plaintiffs. Montanez v. Thompson, 603 F.3d 243, 248 (3d Cir. 2010), as amended (May 25, 2010); Celotex, 477 U.S. at 331 n.2. ("[I]f ... there is any evidence in the record from any source from which a reasonable inference in the [nonmoving party's] favor may be drawn, the moving party simply cannot obtain a summary judgment.")

Although it is unclear from the record whether plaintiffs can establish a TILA violation, the Court nonetheless grants defendants' motion because the plaintiffs are otherwise unable to satisfy their TILA tender obligations.

A.  Right to TILA Rescission

Section 1635(a) of TILA provides that a borrower

> shall have the right to rescind the transaction until midnight of the third business day following the consummation of the transaction or the delivery of the information and rescission forms required under this section together with a statement containing the material disclosures required under this subchapter, whichever is later, by notifying the creditor, in accordance with regulations of the Bureau, of his intention to do so.

15 U.S.C. § 1635 (emphasis added). TILA's implementing regulation, Regulation Z, defines "material disclosures" as those "required disclosures of the annual percentage rate, the finance charge, the amount financed, the total of payments, the payment schedule, and the disclosures and limitations referred to in §§

5

226.32(c) and (d) and 226.35(b)(2)."  12 C.F.R. § 226.23.  These latter limitations refer to the annual percentage rate, the regular payment/balloon payment, the variable rate, and the amount borrowed, among other disclosures.  12 C.F.R. § 32(c).

In their complaint, the plaintiffs contend that rescission is appropriate because the finance charge for the loan was under-disclosed -- that the prepaid finance charge did not include the charge for the yield spread premium, title insurance, the notary fee, the "exorbitant" appraisal, and other charges –- and because they did not receive the pre-settlement variable rate disclosures.  In response, the defendants argue the finance charge was in fact over-disclosed, not under-disclosed, and that the plaintiffs did, in fact, receive the pre-settlement variable rate disclosures.  The Court focuses its analysis on the two "closest" issues: the yield spread premium and the appraisal fee.  The plaintiffs' remaining arguments are without merit.

    1.   <u>Under-Disclosure of Finance Charge</u>

Under TILA, a finance change is defined as "the sum of all charges, payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit."  15 U.S.C. § 1605(a).  A finance charge does not include "fees and amounts imposed by third party closing agents (including settlement

agents, attorneys, and escrow and title companies) if the creditor does not require the imposition of the charges or the services provided and does not retain the charges." Id.

When a foreclosure action on a consumer's principal dwelling is pending, however, a finance charge is considered "accurate" if it is "understated by no more than $35" or if is "greater than the amount required to be disclosed." 12 C.F.R. § 1026.23(h)(2). In other words, it is not a violation of TILA when the estimated finance charge is in fact greater than the final finance charge.

Here, defendants claim that the finance charge was actually over-disclosed. The TILA Disclosure Statement listed a finance charge of $703,904.18. The prepaid finance charge disclosed in connection with the loan was therefore $1,695.82: $705,600.00 (the loan amount) minus $703,904.18. Docket No. 126-1 at 20. Because the actual finance charge was only $1,120.82[7] (according to defendants) -- less than the prepaid finance charge -- the finance charge was not under-disclosed. In that case, the plaintiffs' estimated finance charge was actually over-disclosed

---

[7] Defendants contend that this $1,120.82 is clear from the Settlement Statement and consists of a lender tax service ($67.00), a lender funding fee ($35.00), prepaid interest ($106.32), a notary fee ($10.00), a courier/wire fee ($46.50), an overnight delivery fee ($31.00), an email doc fee ($50.00), a lender admin fee ($750.00), and a lender wire ($25.00) (Docket No. 126-1 at 16-18).

by $575.00 ($1,695.82 minus $1,120.82) and no TILA violation exists.  12 C.F.R. § 1026.23(h)(2) (disclosed finance charge is considered accurate if it is "greater than the amount required to be disclosed).

The problem with this argument is that the defendants' math only works if the Court were to accept that the yield spread premium is not a finance charge and the appraisal fee was "bona fide and reasonable."[8]  On this record, the Court is unable to find definitively so.

      a.   Yield Spread Premium

Section 1605 of title 15 of the U.S. Code provides that the finance charge include a number of fees, including any "[b]orrower-paid mortgage broker fee, including fees paid directly to the broker or the lender (for delivery to the broker) whether such fees are paid in cash or financed."  15 U.S.C. § 1605(a).  The yield spread premium is commonly understood as the "bonus paid to a broker when it originates a loan at an interest rate higher than the minimum interest rate approved by the lender for a particular loan."  Parker v. Long Beach Mortg. Co., 534 F.

---

[8] Section 1026.4(c)(7)(iv) of title 12 of the Code of Federal Regulations provides that"[p]roperty appraisal fees or fees for inspections to assess the value or condition of the property[,] if the service is performed prior to closing," is not properly considered a finance charge unless the fees are not "bona fide and reasonable in amount."  12 C.F.R. § 1026.4(c)(7)(iv).

8

Supp. 2d 528, 536 (E.D. Pa. 2008) aff'd sub nom. Parker v. F.D.I.C., 447 F. App'x 332 (3d Cir. 2011); see also Schuetz v. Banc One Mortg. Corp., 292 F.3d 1004, 1005 (9th Cir. 2002) ("[The yield spread premium] are fees paid by mortgage lenders to mortgage brokers that are based on the difference between the interest rate at which the broker originates the loan and the par, or market rate offered by the lender."). "The lender then rewards the broker by paying it a percentage of the yield spread (i.e., the difference between the interest rate specified by the lender and the actual interest rate set by the broker at the time of origination) multiplied by the amount of the loan." Parker, 534 F. Supp. 2d at 536 (E.D. Pa. 2008).

A number of courts[9] have considered the propriety of a yield spread premium and whether such a fee constitutes a finance charge subject to inclusion in the actual finance charge. Citing the Federal Reserve Board's proposed rules that a yield spread premium should not be disclosed as a pre-paid finance charge because it is already included in the interest rate, a majority of these courts contend that adding a yield spread premium to the finance charge would constitute a double-counting. See, e.g.,

---

[9] The Eleventh Circuit, the only circuit court to explicitly rule on this question of whether a yield spread premium is to be included in the finance charge, noted in an unpublished opinion that "[t]he allegation that the yield spread premium was improperly disclosed is likewise insufficient because it was not a material disclosure under the TILA." Wane v. Loan Corp., 552 F. App'x 908, 912 (11th Cir. 2014).

Parker v. Long Beach Mortg. Co., 534 F. Supp. 2d 528, 536 (E.D. Pa. 2008) aff'd sub nom. Parker v. F.D.I.C., 447 F. App'x 332 (3d Cir. 2011); In re Meyer, 379 B.R. 529, 544 (Bankr. E.D. Pa. 2007) (citing 61 F.R. 26126).  But other courts have found the opposite.  See, e.g., Noel v. Fleet Fin., Inc., 971 F. Supp. 1102, 1110 (E.D. Mich. 1997) ("As an initial matter, the Court finds that the yield spread premium described in the Amended Complaint is a finance charge under TILA.").

The Court does not seek to weigh in on this matter given its conclusion that the plaintiffs are unable to tender back their TILA obligations.

    b. Appraisal Fee

Regulation Z provides that "[p]roperty appraisal fees or fees for inspections to assess the value or condition of the property[,] if the service is performed prior to closing," is not properly considered a finance charge unless the fees are not "bona fide and reasonable in amount."  12 C.F.R. § 1026.4(c)(7)(iv).

The plaintiffs claim that they were charged an "exorbitant" appraisal fee of $825.00.  Docket No. 1.  Although $825.00 hardly appears "exorbitant," the Court is unable to determine whether such a fee is indeed reasonable, given the assessments conducted on the home (i.e., those related to pest-

10

infestation or flood-hazard determinations would increase the appraisal fee).  Neither the defendants nor the plaintiffs have provided the Court any documentary evidence to explain the fees, leaving the Court with a "material fact."  Because "material facts" present a genuine dispute, the Court cannot grant summary judgment to the defendants on this argument.  Smith v. Fid. Consumer Disc. Co., 898 F.2d 896, 906 n.8 (3d Cir. 1990).

### B. Ability to Tender Back Loan Proceeds

Even if the plaintiffs are ultimately able to establish a rescission claim under TILA, however, they have been unable to prove any ability to tender back the now $767,381.88[10] that they would owe if they rescinded their loans.  Docket No. 126.  In that case, the Court must grant defendants' motion for summary judgment.

When a borrower proves that he failed to receive those "material disclosures" required by TILA and exercises his right to rescind, he must return (or tender back) to the lender the money and property the borrower received in the loan transaction. 15 U.S.C. § 1635(b) ("If the creditor has delivered any property to the obligor, the obligor may retain possession of it.  Upon

---

[10] The Court accepts the defendants' sum because the actual sum is irrelevant at this juncture.  Any sums that the defendants' ultimately collect from plaintiffs will be decided in a foreclosure proceeding.

11

the performance of the creditor's obligations under this section, the obligor shall tender the property to the creditor, except that if return of the property in kind would be impracticable or inequitable, the obligor shall tender its reasonable value.")  If a borrower, for whatever reason, fails to exercise a valid right to recession, however -- either because he cannot establish the lender's failure to provide those material disclosures or because he does not have the intent or ability to return the underlying funds or property of this loans -- his rescission becomes ineffective.  Sherzer v. Homestar Mortg. Servs., 707 F.3d 255, 265 (3d Cir. 2013).  In such circumstances, "the lender maintains its security interest in the property and does not incur any obligations toward the borrower."[11]  Id.  In Jobe v. Argent Mortgage Co., LLC, 373 F. App'x 260, 262 (3d Cir. 2010), the Third Circuit confirmed in a non-precedential opinion that plaintiffs testifying that they are unable to repay a loan

---

[11] The Third Circuit goes to great lengths to explain that "certain protections ensure that the lender does not become an unsecured creditor in the event the obligor cannot repay the loan proceeds."  Sherzer v. Homestar Mortgage Servs., 707 F.3d 255, 265 (3d Cir. 2013).  Although 15 U.S.C. § 1635(b) provides that a lender's security interest becomes void at the time of rescission, even before the obligor incurs any repayment obligations, the provision also provides that "courts are permitted to rearrange the parties' obligations to one another." Id.  Because "[o]ne of the goals of § 1635 is 'to return the parties most nearly to the position they held prior to entering into the transaction,'" courts are therefore "permitted to rearrange the parties' obligations to one another under § 1635(b)."  Id.  That is what the Court is doing in this case.

advanced to them, after failing to made payments for more than four years, makes their attempts at rescission "inappropriate." Id.

Other courts have routinely denied rescission where the borrowers were unable to tender payment of the loan amount. See, e.g., Am. Mortg. Network, Inc. v. Shelton, 486 F.3d 815, 820 (4th Cir. 2007) ("[W]hen rescission is attempted under circumstances which would deprive the lender of its legal due, the attempted rescission will not be judicially enforced unless it is so conditioned that the lender will be assured of receiving its legal due."); Yamamoto v. Bank of New York, 329 F.3d 1167, 1173 (9th Cir. 2003) ("Thus, a court may impose conditions on rescission that assure that the borrower meets her obligations once the creditor has performed its obligations. Our precedent is consistent with the statutory and regulatory regime of leaving courts free to exercise equitable discretion to modify rescission procedures."); Williams v. Homestake Mortg. Co., 968 F.2d 1137, 1141 (11th Cir. 1992) ("Thus, according to Williams, the voiding of the creditor's security interest, which Williams argues is guaranteed by the mandate of subsection (d)(1), may not be conditioned on the consumer's tender. Although this is technically correct, it is not a realistic recognition of the full scope of the statutory scheme.").

Given the facts of this case, the Court finds that the plaintiffs are unable to tender back the loan amount and that rescission is thus ineffective. Not only did the plaintiffs fail to respond to defendants' motion for summary judgment -- even after the Court gave the plaintiffs ample time to do so (at this point, more than a full year) -- but Mr. Sherzer conceded in an on-the-record telephone conference almost five months ago that he's "out of money" and, in any event, does not believe he would need to return the money if the loan is rescinded (Docket No. 134). The Court cannot ignore these facts because one of the "goals of [15 U.S.C.] § 1635 is 'to return the parties most nearly to the position they held prior to entering into the transaction.'" <u>Sherzer</u>, 707 F.3d at 265. Mr. Sherzer's statements and beliefs contravene this goal (Docket No. 134). For that reason, the Court grants the defendants' motion.

An appropriate Order shall follow separately.